# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC WHEELER, | ) 1:12cv00861 LJO DLB PC |
| | ) |
| Plaintiff, | ) FINDINGS AND RECOMMENDATIONS |
| | ) REGARDING DEFENDANTS' MOTION |
| | ) FOR SUMMARY JUDGMENT |
| vs. | ) (Document 207) |
| | ) |
| ALLISON, et al., | ) THIRTY-DAY OBJECTION DEADLINE |
| | ) |
| Defendants. | ) |

Plaintiff Eric Wheeler ("Plaintiff") is a prisoner in the custody of the California Department of Corrections and Rehabilitation ("CDCR"). Plaintiff is proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983. This action proceeds on Plaintiff's complaint, filed on May 25, 2012, for violation of the Eighth Amendment against numerous Defendants.

On January 20, 2015, Defendants Murrieta, Lowder, Loftis, Duck, Ancheta, Neubarth, Ross and Allison filed the instant motion for summary judgment.[1] Plaintiff opposed the motion on March 9, 2015, and Defendants filed their reply on March 17, 2015. The motion is ready for decision pursuant to Local Rule 230(l).[2]

---

[1] Defendants provided the requisite notice required by <u>Rand v. Rowland</u>, 152 F.3d 952, 961-963 (9th Cir. 1998).

## I.   <u>LEGAL STANDARD</u>

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted); <u>Washington Mutual Inc. v. U.S.</u>, 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The Court may consider other materials in the record not cited to by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); <u>Carmen v. San Francisco Unified School Dist.</u>, 237 F.3d 1026, 1031 (9th Cir. 2001); accord <u>Simmons v. Navajo County, Ariz.</u>, 609 F.3d 1011, 1017 (9th Cir. 2010).

Defendants do not bear the burden of proof at trial and in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case.  <u>In re Oracle Corp. Securities Litigation</u>, 627 F.3d 376, 387 (9th Cir. 2010) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986)).  If Defendants meet their initial burden, the burden then shifts to Plaintiff "to designate specific facts demonstrating the existence of genuine issues for trial." <u>In re Oracle Corp.</u>, 627 F.3d at 387 (citing <u>Celotex Corp.</u>, 477 U.S. at 323).  This requires Plaintiff to "show more than the mere existence of a scintilla of evidence."  <u>Id</u>. (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252, 106 S.Ct. 2505 (1986)).

In judging the evidence at the summary judgment stage, the Court may not make credibility determinations or weigh conflicting evidence, <u>Soremekun v. Thrifty PayLess, Inc.</u>, 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all

---

[2]  Defendant Mui filed a motion for summary judgment in December 2014, and the Court has addressed it by separate Findings and Recommendations.

inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, <u>Comite de Jornaleros de Redondo Beach v. City of Redondo Beach</u>, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted), cert. denied, 132 S.Ct. 1566 (2012).  The Court determines only whether there is a genuine issue for trial, and Plaintiff's filings must be liberally construed because he is a pro se prisoner.  <u>Thomas v. Ponder</u>, 611 F.3d 1144, 1150 (9th Cir. 2010) (quotation marks and citations omitted).

## II.    <u>SUMMARY OF PLAINTIFF'S ALLEGATIONS</u>

Plaintiff is currently incarcerated at Mule Creek State Prison.  The events at issue occurred while Plaintiff was incarcerated at the California Substance Abuse Treatment Facility ("CSATF") in Corcoran, California.

Plaintiff alleges that on January 19, 2011, while he was returning to his housing unit after breakfast, he was attacked by Inmate Yepiz.  He alleges that when he was attacked, there were no officers present.  Yepiz struck Plaintiff in the right and left jaw area and ran away.  Plaintiff pursued him, past the G-1 office where Defendant Duck and Murrieta were engaged in conversation.  An inmate told Plaintiff that he heard Defendant Murrieta tell Defendant Duck to wait to call an alarm until Plaintiff and Yepiz were fighting.  He also states that an inmate informed him that Yepiz was a "snitch" for Defendants Murrieta, Loftis and Lowder.

Yepiz ran into the dayroom and Plaintiff unsuccessfully tried to grab the back of his collar from behind.  Yepiz then got down onto his stomach.  Plaintiff, who has post-traumatic stress disorder ("PTSD"), stood frozen with panic.  Without provocation, Defendant Duck approached Plaintiff from the left side and struck Plaintiff's left knee with her baton.  Defendant Duck struck Plaintiff a second time.

Defendant Murrieta then sprayed pepper-spray into Plaintiff's eyes and face numerous times.  Defendant Murrieta also hit other guards, including Defendant Loftis, with the pepper-spray.  Defendant Loftis exited immediately and did not return.  Defendant Duck struck Plaintiff

3

a third time, hitting Plaintiff's upper left thigh.  Defendant Lowder, who was standing to the left of Duck and Plaintiff, sprayed pepper spray on the left side of Plaintiff's head.  Plaintiff turned towards Murrieta to avoid Duck's baton, and Murrieta continued to spray pepper spray in Plaintiff's face.  Plaintiff dropped his head down and was then hit with a fourth blow from Defendant Duck's baton.  The baton struck the left side of Plaintiff's neck and the top of his head.  Defendant Duck was then hit with Defendant Murrieta's pepper spray, and she stopped hitting Plaintiff and left the area.

Defendant Murrieta then handcuffed Yepiz and escorted him away.  Plaintiff, with no officers present and in extreme pain, lay down on the dayroom floor.  He was assisted to his feet by Officer Hughes and limped, uncuffed, to the shower.  Plaintiff contends that he did not act aggressively towards Defendants Duck, Lowder, Murrieta or Loftis at any time.

On January 19, 2011, Defendant Ross examined Plaintiff.  Plaintiff explained what happened and complained of severe pain in his jaw, left knee, left thigh and neck.  Ross consulted a dentist, who ordered x-rays.  The x-rays revealed jaw fractures and required transport to the hospital.  Plaintiff alleges that Defendant Ross told him that he would not receive treatment for his neck, left knee or left thigh because Plaintiff was assaulted by staff.  Defendant Ross did not refer Plaintiff for treatment of these injuries.

On January 19, 2011, Plaintiff was transported to Mercy Hospital.  In the emergency room, Plaintiff told staff that he sustained injuries to his left knee, left thigh and neck, and that he was in severe pain.  A doctor in the emergency room noted these complaints in his reports.  Examination revealed mild swelling of the left knee.  A CT scan of Plaintiff's face showed a mandibular fracture.  An x-ray of Plaintiff's left knee showed a prominent effusion and a non-displaced fracture of the distal femur.

Plaintiff was admitted to Mercy Hospital and underwent a closed reduction of the jaw, with fixation, on January 20, 2011.

On January 21, 2011, Plaintiff was discharged from Mercy Hospital and admitted to the prison infirmary.  After surgery, his jaw would be wired shut for five to six weeks.  Plaintiff was placed under the care of Defendant Neubarth.  Plaintiff informed him that he could not put weight on his left leg, and Defendant Neubarth was aware of the x-ray done at Mercy Hospital. Despite this, Defendant Neubarth kept ordering Plaintiff to walk and exercise his left leg.  He did not refer Plaintiff for an MRI, or order any treatment.

On February 22, 2011, Plaintiff was transported to see Dr. Suesberry.  He cut the bands holding Plaintiff's jaw closed and told Plaintiff that he would remove the wires, bars and arches on March 8, 2011.  Plaintiff alleges that Defendant Neubarth was responsible for requesting the follow-up on March 8, 2011, and knew of Dr. Suesberry's February 22, 2011, orders.  However, Defendant Neubarth failed to request further treatment and Plaintiff went 55 days past March 8, 2011, with the wires, bars and arches intact.

On February 24, 2011, Plaintiff was discharged from the prison infirmary and placed in Ad-Seg.

On March 9, 2011, Plaintiff saw Defendant Ancheta, a dentist.  Plaintiff told him that he was supposed to see Dr. Suesberry on March 8, 2011, for removal of the hardware.  Dr. Ancheta told Plaintiff that she would take care of everything.  Dr. Ancheta failed to request further treatment, however.

On March 11, 2011, Plaintiff was examined by P.A. Byers after submitting a health care request.  Byers said that something was wrong with Plaintiff's left knee and ordered an MRI, which was performed on May 3, 2011.  On May 5, 2011, Plaintiff was referred to specialist Dr. Smith.  During his examination on July 6, 2011, Dr. Smith noted that Plaintiff was still in severe pain and had reduced range of motion and weakness in the left knee.

On April 3, 2012, Plaintiff was medically declared permanently mobility impaired.  As of March 22, 2012, he was awaiting surgery for a left hernia due to his left knee and thigh injuries.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## III.   UNDISPUTED MATERIAL FACTS

At all relevant times, Plaintiff was incarcerated at CSATF in the Facility G-1, Enhanced Outpatient Program ("EOP").  ECF No. 1 (Complaint), at 8.

On January 19, 2011, Plaintiff was the victim of a battery by Inmate Yepiz while he was returning to his assigned housing unit in Building G-1 from breakfast.  He sustained a broken jaw.  ECF No. 1, at 8-9.

Plaintiff had left the Facility G dining hall and was walking towards Building G-1 when the attack took place.  Pl.'s Dep. 116:22-117:5.  When he left the Facility G dining hall, correctional officers were at the exit door performing random pat-down searches.  Pl.'s Dep. 114:11-22.  Plaintiff was approximately fifty to sixty feet away from the Facility G dining hall, and approximately thirty-five feet away from the entrance to Building G-1, when the battery took place.  Pl.'s Dep. 117:1-5, 118:8-13.  No correctional officers were assigned to stand in front of the Facility G-1 housing unit.  Pl.'s Dep. 117:6-10.[3]

Defendant Allison was the Warden of CSATF on January 19, 2011.  Allison Decl. ¶ 2. Defendant Allison was unaware of any unstaffed custody positions at Facility G-1 at SATF, as of January 19, 2011, and believed that all custody positions were filled as of that date.[4]  Allison Decl. ¶ 4.  Defendant Allison believed that all assigned correctional staff were in place as of January 19, 2011.  Allison Decl. ¶ 4.  As of January 19, 2011, based on her experience and review of an Operational Procedure, Defendant Allison believed that inmates walking between

---

[3] Plaintiff adds that he was inside a newly fenced area in a crowd of forty to fifty inmates, with no officers present due to Defendant Allison's failure to create a post order and hire adequate staff.  Plaintiff's additional information does not dispute Defendants' facts, and Plaintiff's "fact" about Defendant Allison is simply argument.  Arguments or contentions set forth in a responding brief do not constitute evidence.  See Coverdell v. Dep't of Soc. & Health Servs., 834 F.2d 758, 762 (9th Cir. 1987).

[4] Plaintiff attempts to dispute this by arguing that Defendant Allison was generally responsible for creating post orders, but this does not dispute Defendant Allison's knowledge as of January 11, 2011.  Plaintiff also suggests that she was aware of staff grievances, but his evidence deals with a concern over a shortage of mental health *clinicians* raised during a December 20, 2010, EOP Local Operational Meeting.  ECF No. 227, at 89-90.  Similarly, Plaintiff's evidence relating to staff shortages *after* the incident is irrelevant.  ECF No. 227, at 92.

the Facility G dining hall and their housing units would be supervised by the Facility Sergeant and/or his designees, and were adequately supervised.  Allison Decl. ¶ 5.

Prior to January 19, 2011, Defendant Allison was unaware of any incidents involving inmates from Facility G-1 assaulting each other while walking between their housing units and the Facility G dining hall for the morning meal.[5]  Allison Decl. ¶ 6.

Plaintiff submitted a 602 inmate appeal, dated September 7, 2010, contending that staffing shortages at Facility G-1 endangered the safety and security of the facility, custody staff and inmates.  Allison Decl. ¶ 7.

In response to Plaintiff's appeal, Defendant Allison noted that, due to the fiscal crisis affecting the State of California and CDCR at that time, selected custody positions were re-directed on a rotational basis.  Facility G was affected during Second Watch on Thursdays and Sundays, and on Third Watch on Tuesdays.  Allison Decl. ¶ 8.  As the incident in question occurred on Wednesday, January 19, 2011, during Second Watch, Facility G was unaffected by the re-direction of selected custody positions at that time.  Allison Decl. ¶ 8.

The two additional custody positions referred to by Defendant Allison in the Second Level Response were staffed as of January 19, 2011.  Allison Decl. ¶ 8.

After being struck by Yepiz, Plaintiff chased after Yepiz into the rotunda of Facility G-1.  Pl.'s Dep. 120:2-6.  After entering Facility G-1, Plaintiff ran past Defendants Murrieta and Duck.  Pl.'s Dep.  122:9-10, 126:1-6.  Defendant Murrieta activated his personal alarm.  Murrieta Decl. ¶ 4.  Defendants Murrieta and Lowder ordered both inmates to get down into a prone position, but Plaintiff did not comply with these commands.  Murrieta Decl. ¶ 4; Lowder Decl. ¶ 6.

---

[5] Plaintiff again argues that Defendant Allison approved and built a fenced area in 2010, but this does not dispute her contention that she was unaware of any incidents on inmate violence.  Plaintiff also suggests that Defendant Allison failed to consult with members of the California Correctional Peace Officers Association, but this failure does not establish any knowledge on her part of a risk of harm.

Plaintiff states that he did not hear any commands to get down onto the ground before he was exposed to pepper spray and struck with a baton.  Pl.'s Dep. 137:10-19.[6]

Defendants Murrieta used his pepper spray on Plaintiff, spraying him in the face, using less than an entire canister.  Murrieta Decl. ¶ 5; Lowder Decl. ¶ 7.  Defendant Lowder administered short, one-second bursts of pepper spray towards Plaintiff and Yepiz's facial areas, while continuing to order them to get down onto the ground, but Plaintiff did not comply with these commands.[7]  Lowder Decl. ¶ 7.

Defendant Duck responded to an alarm and arrived at the scene of the incident, standing behind Plaintiff, on his right side, with Defendants Lowder and Murrieta standing in front of Plaintiff.  Duck Decl. ¶ 3.  Defendant Duck observed Defendants Lowder and Murrieta order Plaintiff to get onto the ground, and pepper spray Plaintiff when he did not comply with their orders.  Duck Decl. ¶ 3.

Defendant Duck struck Plaintiff in the Leg with her baton.  Duck Decl. ¶ 5.  Once Plaintiff got down on the ground, no further force was used against him.  Murrieta Decl. ¶ 9; Lowder Decl. ¶ 12; Duck Decl. ¶ 6.

Prior to January 2011, Plaintiff had been diagnosed with PTSD.  Pl.'s Dep. 77:13-15.  During the incident on January 19, 2011, Plaintiff froze with terror and shock due to his PTSD and pain from his jaw.  Pl.'s Dep. 145: 18-21.

---

[6]  Plaintiff now alleges "Defendants did not give any commands to get down before [he] was attacked and struck." ECF No. 226, at 8.  Similarly, in his opposition, he says that Defendants Murrieta and Duck did not "sa[y] a word" to him.  ECF No. 227, at 4.  Plaintiff's statements are not sufficient to create a dispute of fact.  First, he does not explain how he knows that Defendants Duck or Murrieta did not actually give the command.  Second, and more importantly, during his deposition, Plaintiff was asked if he did not hear the command, or if he believed that the commands were not given.  Plaintiff stated, "I did not hear it."  Pl.'s Dep. 137:10-19.  Plaintiff cannot now dispute Defendants' facts by contradicting his prior testimony.  Van Arsdale v. Int'l Game Tech., 577 F.3d 989, 998 (9th Cir. 2009).

[7]  Plaintiff states that Defendants Murrieta and Lowder used a whole canister each, but he does not support his contention with any facts.  Plaintiff must designate specific facts demonstrating the existence of genuine issues for trial.  In re Oracle Corp., 627 F.3d at 387 (citing Celotex Corp., 477 U.S. at 323).

Defendants Murrieta, Lowder, and Duck had no prior knowledge that Plaintiff had been diagnosed with PTSD, or had any physical or mental condition which would have prevented him from understanding or complying with their orders.[8]  Murrieta Decl. ¶ 8; Lowder Decl. ¶ 3; Duck Decl. ¶ 7.

Defendants Murrieta, Lowder and Duck had been trained in CDCR's use of excessive force policy, which allowed the reasonable use of necessary force to subdue an attacker, overcome resistance, effect custody or gain compliance with a lawful order.  Murrieta Decl. ¶ 2; Lowder Decl. ¶ 2; Duck Decl. ¶ 2.

Defendant Loftis responded to a personal alarm from another correctional officer.  Loftis Decl. ¶ 3.  When Defendant Loftis arrived at the dayroom, he observed Yepiz lying on his back, with Plaintiff standing next to him.  Loftis Decl. ¶ 4.  He also saw Defendants Lowder and Murrieta issuing verbal commands to the inmates to get down on the ground.  Loftis Decl. ¶ 4.  Plaintiff did not comply with these commands, and Defendant Loftis observed Defendant Lowder use pepper spray, while Defendant Loftis was standing approximately thirty feet away from Defendant Lowder.  Loftis Decl. ¶ 5.  Defendant Loftis moved towards Plaintiff, but he was struck in the face and chest with pepper spray, which impaired his vision.  Loftis Decl. ¶ 5.  As a result, Defendant Loftis left the area immediately so that he could be decontaminated.  Loftis Decl. ¶ 5.

After the incident, Plaintiff was evaluated by a Licensed Psychiatric Technician and was then taken to the Correctional Treatment Center ("CTC").  Pl.'s Dep. 152:12-153:15.  Plaintiff was examined by Registered Nurse Del Rosario, who referred him to Defendant Ross, a Physician's Assistant.  Pl.'s Dep. 155:19-156:21.

---

[8]  Plaintiff attempts to dispute their lack of knowledge by arguing that they "were fully informed and aware" that Plaintiff had PTSD because (1) Plaintiff was housed in a treatment program for inmates with mental disabilities; and (2) Defendants participated in clinical observations of EOP inmates in 2010 and 2011.  However, Plaintiff's claims are too general and do not specifically show that Defendants Murrieta, Lowder and Duck knew that *he* had PTSD, or any other disability that would impact his ability to comply with orders.

Defendant Ross examined and interviewed Plaintiff on January 19, 2011, in the Triage and Treatment Area of CSATF.  Plaintiff's chief complaint was facial trauma after an assault, along with complaints of pain to his jaw, the back of his head, and to the front of his left thigh and knee.  Plaintiff denied experiencing any loss of consciousness or dizziness.  Ross Decl. ¶ 3. Defendant Ross conducted a physical examination and noted that Plaintiff had discoloration and mild edema to the anterior aspect of his left thigh at the midpoint, tenderness to palpation at various points on his jaw and laceration/disruption of the gum tissue.[9]  Ross Decl. ¶ 4. Defendant Ross did not observe any obvious signs of a fracture to Plaintiff's left leg, such as deformity of the Leg.  Ross Decl. ¶ 4.[10]

Defendant Ross consulted with Dr. Lee, a dentist, who ordered panorex x-rays of Plaintiff's jaw.  The x-rays revealed two fractures.  Ross Decl. ¶ 4.

Defendant Ross assessed Plaintiff has having a fractured mandible and arranged for Plaintiff to be transported to Mercy Hospital, where he would be evaluated by Dr. Mui, who could provide a higher level of care for his jaw fractures.[11]  Ross Decl. ¶ 5.  Defendant Ross believed at the time that Plaintiff's most serious medical need, which required immediate medical attention, was his fractured jaw.  Ross Decl. ¶ 6.

Defendant Ross was aware that Plaintiff had sustained an injury to his Leg, which he documented.

---

[9] Plaintiff argues that Defendant Ross never performed a "hands-on" examination of his entire left leg.  The thoroughness of the examination, however, is irrelevant to the fact that some form of an examination took place. ECF No. 227, at 30.

[10] Plaintiff suggests that Defendant Ross' declaration is "self-serving," and was written four years after being sued. A Defendant is entitled to defend himself by way of a declaration, which by its nature will likely be self-serving.  As to the length of time that has passed, Plaintiff offers no reason to question Defendant Ross' recollection of his interaction with Plaintiff.

[11] Plaintiff attempts to dispute this by arguing that Defendant Ross did not refer Plaintiff for his left leg injury.  This does not dispute the statement, however.

Plaintiff's left leg was examined and x-rayed at Mercy Hospital.  Pl.'s Dep. 163:19-164:2.  The physicians at Mercy Hospital determined that Plaintiff had sustained a non-displaced fracture of the left femur.

Defendant Neubarth encountered Plaintiff at the CTC at CSATF on January 21, 2011, after Plaintiff was discharged from Mercy Hospital.  Neubarth Decl. ¶ 3.  The inmate discharge summary from Mercy Hospital referred to a discharge diagnosis of status post closed reduction of the left mandibular fracture, but did not refer to a left leg injury.  Neubarth Decl. ¶ 3; ECF No. 1, at 63-64.  Defendant Neubarth prescribed treatment for the fractured jaw, including a special diet, wound observation and pain control.  The pain control consisted of acetaminophen with codeine, followed by Naproxen and Ibuprofen, taken three times per day.  Neubarth Decl. ¶ 4; ECF No. 1, at 86-876.

During the intake evaluation performed on January 21, 2011, Plaintiff complained of pain in his left knee and lower thigh.  Defendant Neubarth felt that the pain medications he prescribed would provide adequate pain control for his Leg complaints.[12]  Neubarth Decl. ¶ 4.

Defendant Neubarth examined Plaintiff's left leg on January 24, 2011, and observed that there was almost no swelling about the left knee and thigh, although there was some discoloration in the area.[13]  Neubarth Decl. ¶ 5; ECF No. 1, at 88.  In response to Plaintiff's continued complaints of pain in his left leg, Defendant Neubarth performed a bedside ultrasound examination of his left leg, which was normal.  He also ordered x-rays of the left leg and knee to determine if a fracture had occurred.[14]  Neubarth Decl. ¶ 6.

---

[12]  Plaintiff argues that he complained of severe pain and could not bear weight on his left leg.  This does not dispute Defendant Neubarth's contention that he believed the medication he prescribed would be sufficient for Plaintiff's Leg pain.

[13]  Plaintiff argues that the "excessive force videotaped on January 24, 2011, in CTC Room 34 counters Defendant Neubarth's statement and will show Neubarth's medical incompetent [sic], deficient medical care, attention to Plaintiff's left leg."  ECF No. 226, at 20.  Plaintiff's alleged evidence does not alter Defendant Neubarth's interpretation of his observation, and his Legal conclusions are not relevant.

[14]  Plaintiff disputes this, arguing that Defendant Neubarth knew of the x-rays taken at Mercy Hospital, and that all he "did was caused [sic] severe pain by pressing down hard on Plaintiff's knee with an old, outdated ultrasound

Defendant Neubarth received a report from the radiologist, who interpreted the x-rays as demonstrating a vertical lucent line with sclerosis along the lateral aspect of the femoral condyle, which most likely represented an osteophyte, rather than a true fracture.  This report also raised the possibility that this line represented an old fracture.  The report stated that there were no intraarticular free fragments and no suprapatellar effusion.  No displacement or deformity was noted.[15]  Neubarth Decl. ¶ 6.

Defendant Neubarth interpreted the results of the ultrasound and x-ray studies as demonstrating that Plaintiff had not sustained a fracture of his left thigh, and that he was suffering from a bruised thigh.  He therefore maintained the prescription for Naproxen and Ibuprofen and recommended gentle range of motion care consisting of daily movement and stretching to enhance the healing process and prevent the development of complications.[16]  Neubarth Decl. ¶ 7.

Defendant Neubarth continued to monitor the condition of Plaintiff's left leg on January 27 and 30 and February 2, 4 and 7, 2011.[17]  Defendant Neubarth's examinations showed no swelling or deformity of the left leg.  Neubarth Decl. ¶ 8; ECF No. 1, at 89-90, 92.

In order to further evaluate Plaintiff's complaints, Defendant Neubarth ordered follow-up x-rays of the left leg on February 16, 2011, but he did not actually receive the February 22, 2011, report from the radiologist at that time because Plaintiff was discharged from the CTC on

machine that he was not cleared to use." ECF No. 226, at 20.  Plaintiff's "facts" are irrelevant to Defendant Neubarth's fact and do not render the statement disputed.

[15] Plaintiff contends that the radiologist's interpretation is faulty because of the differing x-ray taken at Mercy Hospital and a May 4, 2011, MRI.  The fact that there may be differing diagnostic test results, alone, does not call the radiologist's interpretation into question.  Plaintiff does not submit any competent evidence to question the interpretation.

[16] Plaintiff contends that Defendant Neubarth never examined his left thigh or hip.  This directly contradicts Defendant Neubarth's treatment notes, however, and other than simply denying the existence of any examinations, he does not address the treatment notes.

[17] Plaintiff alleges that Defendant Neubarth did not monitor the condition of his left leg, and that his cursory examinations were "lip service."  Plaintiff's characterization of the examinations is his opinion, and is not sufficient to dispute the fact.

February 23, 2011.  The x-ray report was forwarded to Plaintiff's primary care physician at the portion of the prison where Plaintiff was housed.  Neubarth Decl. ¶ 8.  The x-rays were unchanged from the prior x-rays taken on January 24, 2011, which did not show a fracture.  Neubarth Decl. ¶ 8, Ex. 2.  Based on Defendant Neubarth's review of the January 24, 2011, x-ray study and his observation of Plaintiff, he believed that Plaintiff had not sustained a fracture to his left leg, and that he should continue to try and improve the range of motion.  Neubarth Decl. ¶ 9.  In his experience, he knew that exercising a limb which has been injured can be painful in the short term, but that improving range of motion is preferable to possible complications that can result from excessive immobilization.[18]  Neubarth Decl. ¶ 9.  Defendant Neubarth maintained the Ibuprofen prescription for pain control.  Neubarth Decl. ¶ 9.  His recommendation of exercise was for the purpose of preventing complications, not to inflict unnecessary pain.  Neubarth Decl. ¶ 9.  In light of the results of the January 24, 2011, x-rays and the normal ultrasound, and the lack of swelling or deformity observed during examinations, Defendant Neubarth did not feel that either an MRI study or a CT scan of the left leg was medically indicated at that time.  Neubarth Decl. ¶ 10.

        While Plaintiff was in the CTC, Defendant Ancheta, a dentist, followed his jaw fracture.  On February 8, 2011, Defendant Ancheta, along with Dr. Beregovskaya, recommended that Plaintiff be examined by the specialist who had treated his jaw fracture at Mercy Hospital, Dr. Suesberry.  Neubarth Decl. ¶ 11.  Defendant Neubarth understood that Dr. Suesberry examined Plaintiff on February 22, 2011, and released the occlusion bars that were holding his teeth together.  Neubarth Decl. ¶ 11; ECF No. 1-1, at 21.  Once the occlusion bars were released, CTC procedure called for Plaintiff to be released from the CTC and returned to the prison.  He was released from the CTC on February 23, 2011.  Neubarth Decl. ¶ 12.  Defendant Neubarth understood that health care personnel assigned to the portion of the prison where Plaintiff was

---

[18]  Plaintiff appears to question Defendant Neubarth's opinions because he believes his primary practice is anesthesiology.  Plaintiff's opinion is not sufficient to call Defendant Neubarth's professional opinions into question.

13

housed would provide appropriate follow-up care.  Such care included the removal of the remaining wires and hardware in Plaintiff's jaw.  Neubarth Decl. ¶ 13.

Plaintiff first saw Defendant Ancheta on February 8, 2011, while he was hospitalized at the CTC.  Plaintiff's jaw had been wired shut since January 21, 2011, and he requested a mouth rinse.  Defendant Ancheta prescribed chlorhexidine rinse, twice a day.  Ancheta Decl. ¶ 3.  Defendant Ancheta understood that Plaintiff would be seen by an outside specialist, Dr. Suesberry, for a post-surgical check, within a short period of time.  She further understood that Plaintiff would submit a CDCR 7362 Request for Health Care Services form after the appointment with Dr. Suesberry.  Ancheta Decl. ¶ 3.

After Plaintiff submitted a Request for Health Care Services form on February 23, 2011, Defendant Ancheta examined Plaintiff in the CTC on March 9, 2011.  Although Plaintiff's chart was not available, Defendant Ancheta examined Plaintiff and found that the brackets and wires inserted during the surgery of January 21, 2011, were still present, and that his number 22 tooth had a traumatic occlusion.  She therefore leveled the number 22 tooth to an acceptable level with a diamond burr.[19]  Ancheta Decl. ¶ 4.

Since Plaintiff was only approximately six weeks post-injury, Defendant Ancheta was concerned whether his jaw fractures had healed sufficiently to proceed with the removal of the remaining brackets and wires.  In her experience and training, removing surgical hardware from a fractured jaw prematurely could lead to further injury to the jaw and permanent malocclusion of the teeth.  Ancheta Decl. ¶ 4.  In Defendant Ancheta's professional opinion, it was unclear whether, on March 9, 2011, Plaintiff's jaw fracture had healed sufficiently to proceed with removal of the hardware, so she decided not to do so.  Ancheta Decl. ¶ 4.

Defendant Ancheta then ordered panoflex x-rays.  Ancheta Decl. ¶ 5.

---

[19] As he did with Defendant Ross, Plaintiff suggests that Defendant Ancheta's declaration is "self-serving," and was written four years after being sued.  This argument fails for the same reasons explained above.

14

After March 9, 2011, Plaintiff was transferred to a different yard and Defendant Ancheta did not have any responsibility for his follow-up dental care.  Ancheta Decl. ¶ 6.

Plaintiff was next examined by Dr. Lee, a dentist on G Yard, on April 1, 2011.  Dr. Lee made arrangements for Plaintiff to be sent to an outside specialist for the removal of the remaining brackets and wires.  Ancheta Decl. ¶ 6; ECF No. 1-1, at 35-36.

Plaintiff was referred to physical therapy on July 6, 2011.  ECF No. 1-1, at 53.

As of October 21, 2011, Plaintiff had no swelling about his left knee and could ambulate without effort.  ECF No. 1-1, at 65-66.

As of January 2012, the fracture of the lateral femoral condyle disclosed on the May 3, 2011, MRI, had healed.  Plaintiff did not require any further treatment from an orthopedist for the knee injury, including surgery.[20]  ECF No. 1-1, at 68.

On April 3, 2012, Plaintiff was declared "permanently mobility impaired" and permitted to use a cane for ambulation.  ECF NO. 1-1, at 71.

IV.   **DISCUSSION**

    A.   Excessive Force

        1.   *Legal Standard*

The Cruel and Unusual Punishments Clause of the Eighth Amendment protects prisoners from the use of excessive physical force.  Wilkins v. Gaddy, 559 U.S. 34, 37, 130 S.Ct. 1175 (2010) (per curiam); Hudson v. McMillian, 503 U.S. 1, 8-9, 112 S.Ct. 995 (1992).  What is necessary to show sufficient harm under the Eighth Amendment depends upon the claim at issue, with the objective component being contextual and responsive to contemporary standards of decency.  Hudson, 503 U.S. at 8 (quotation marks and citations omitted).  For excessive force claims, the core judicial inquiry is whether the force was applied in a good-faith effort to

---

[20]  Plaintiff attempts to dispute this by arguing that he never had an MRI to determine whether the fracture was healed in 2012.  This does not dispute the fact that on January 19, 2012, Dr. Smith examined Plaintiff and determined that the fracture had healed and that he did not need further orthopedic treatment.

maintain or restore discipline, or maliciously and sadistically to cause harm.  Wilkins, 559 U.S. at 37 (citing Hudson, 503 U.S. at 7) (quotation marks omitted).

Not every malevolent touch by a prison guard gives rise to a federal cause of action. Wilkins, 559 U.S. at 37 (citing Hudson, 503 U.S. at 9) (quotation marks omitted).  Necessarily excluded from constitutional recognition is the de minimis use of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind.  Wilkins, 559 U.S. at 37-8, 130 S.Ct. at 1178 (citing Hudson, 503 U.S. at 9-10) (quotations marks omitted).  In determining whether the use of force was wanton and unnecessary, courts may evaluate the extent of the prisoner's injury, the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response.  Hudson, 503 U.S. at 7 (quotation marks and citations omitted).

While the absence of a serious injury is relevant to the Eighth Amendment inquiry, it does not end it.  Hudson, 503 U.S. at 7.  The malicious and sadistic use of force to cause harm always violates contemporary standards of decency.  Wilkins, 559 U.S. at 37 (citing Hudson, 503 U.S. at 9) (quotation marks omitted).  Thus, it is the use of force rather than the resulting injury which ultimately counts.  Id. at 37-8.

   2.   *Analysis*

Defendants Murrieta, Duck and Lowder contend that they used a reasonable amount of force on Plaintiff to gain compliance with orders and to prevent an attack by Plaintiff.

It is undisputed that Plaintiff was attacked by Inmate Yepiz on January 19, 2011, while he was returning to his assigned housing unit in Building G-1 from breakfast.  After being struck by Yepiz, Plaintiff chased after Yepiz into the rotunda of Facility G-1.  In fact, in his opposition, Plaintiff admits that he "had to pursue his attacker. . . to prevent Yepiz from getting away and/or attacking the Plaintiff again."  ECF No. 227, at 4.  He ran past Defendants Murrieta and Duck. Defendant Murrieta activated his personal alarm.

16

At this point, the parties dispute whether Defendants Murrieta and Lowder observed Plaintiff strike Yepiz. Defendants Murrieta and Lowder state that they observed Plaintiff strike Yepiz as Yepiz was walking into Facility G-1, B section. Murrieta Decl. ¶ 3; Lowder Decl. ¶ 5. Plaintiff, on the other hand, asserts that he did not strike Yepiz. Whether or not Plaintiff actually struck Yepiz is not the deciding factor, however. Plaintiff admits that he decided to chase after Yepiz. He also states in his opposition that he made an "unsuccessful attempt to grab Yepiz's jacket from behind. . ." ECF No. 227, at 5. Therefore, given Plaintiff's admissions that he was chasing after Inmate Yepiz and was trying to grab his jacket, whether or not any actual punches were thrown is immaterial. At the very least, it is undisputed that Plaintiff was chasing and attempting to grab another inmate.

Defendants Murrieta and Lowder ordered both inmates to get down into a prone position, but Plaintiff did not comply with these commands. Plaintiff maintains that he did not hear the commands, but even if Plaintiff did not hear the command, Defendants Murrieta and Lowder were faced with an immediate situation involving an inmate chasing another inmate and not following orders. At that time, they did not know whether Plaintiff heard the commands or not.

Defendant Murrieta then pepper-sprayed Plaintiff in his face, using less than an entire canister. Defendant Lowder also administered short, one-second bursts of pepper spray towards the facial areas of Plaintiff and Yepiz, while continuing to order them to get down on the ground, bur Plaintiff did not comply with the commands.

The parties dispute whether the use of pepper spray by Defendants Murrieta and Lowder was to gain compliance with their orders and to prevent an attack by Plaintiff on Yepiz, or whether the force was maliciously and sadistically applied to cause harm. Murrieta Decl. ¶ 9; Lowder Decl. ¶ 7. However, the undisputed facts until this point show that Plaintiff decided to chase inmate Yepiz and attempted to grab his collar. Defendants Murrieta and Lowder ordered Plaintiff to get down, but he did not comply with orders. Under these facts, the use of pepper

17

spray by Defendants Murrieta and Lowder was a good-faith effort to maintain or restore discipline.

It is further undisputed that Defendant Duck responded to an alarm and arrived at the scene of the incident, standing behind Plaintiff, on his right side, with Defendants Lowder and Murrieta standing in front of Plaintiff.  She observed Defendants Lowder and Murrieta order Plaintiff to get onto the ground, and pepper spray Plaintiff when he did not comply with their orders.

The remaining facts are disputed.  Defendant Lowder states that Plaintiff turned to face him in a fighting stance, with clenched fists, and swung at him.  Lowder Decl. ¶ 10.  Plaintiff denies this.  Defendant Lowder contends that in order to prevent an attack, he struck Plaintiff's left thigh with two blows.  Plaintiff believes that only Defendant Duck struck him with a baton. Pl.'s Dep. 145:24-146:2.  As Plaintiff does not contend that Defendant Lowder struck him with a baton, these facts are not relevant to Defendant Lowder's use of force.

Insofar as these facts relate to Defendant Duck's use of force, it is undisputed that, at the very least, Defendant Duck observed Defendants Murrieta and Lowder use pepper spray when Plaintiff did not comply with their orders.  Therefore, whether or not Plaintiff attempted to attack Defendant Lowder, Defendant Duck knew that Plaintiff was disobeying orders.

At this point, Defendant Duck contends that she ordered Plaintiff to get down to the ground, but he did not comply with her command.  Duck Decl. ¶ 5.  Defendant Duck then used her baton and struck Plaintiff's right thigh.[21]  Duck Decl. ¶ 5.  Plaintiff, however, denies that Defendant Duck gave any orders prior to striking him.  Rather, Plaintiff contends that during the incident, he froze with terror and shock due to his PTSD and pain from his jaw.  Pl.'s Dep. 145: 18-21.

---

[21]  Plaintiff believes that only Defendant Duck struck him with a baton, and that she only struck his left leg.  This dispute is not relevant, as the Court has found Defendant Duck did not use excessive force regardless of which Leg received the strikes.

Defendants do not dispute that Plaintiff had been diagnosed with PTSD prior to January 2011, and they do not dispute his contention that he "froze" with terror and shock during the incident. It is therefore not material whether Defendant Duck actually gave any commands because the parties agree that Plaintiff stood there, without movement. Defendant Duck saw Plaintiff refusing to comply with prior orders and is it undisputed that Plaintiff continued to stand.[22] Moreover, it is undisputed that Defendants Murrieta, Lowder, and Duck had no prior knowledge that Plaintiff had been diagnosed with PTSD, or had any physical or mental condition which would have prevented him from understanding or complying with their orders.

Based on the undisputed facts, the Court finds that Defendants Murrieta, Lowder and Duck did not use excessive force in violation of the Eighth Amendment, and that summary judgment should be entered in their favor on this claim. Bell v. Wolfish, 441 U.S. 520, 547 (1979) ("Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.").

B.   Failure to Protect

1.   *Legal Standard*

Prison officials have a duty under the Eighth Amendment to protect prisoners from violence at the hands of other prisoners because being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society. Farmer, 511 U.S. at 833-34 (quotation marks omitted); Clem v. Lomeli, 566 F.3d 1177, 1181 (9th Cir. 2009); Hearns v. Terhune, 413 F.3d 1036, 1040 (9th Cir. 2005). However, prison officials are liable under the Eighth Amendment only if they demonstrate deliberate indifference to conditions posing a substantial risk of serious harm to an inmate; and it is well settled that deliberate indifference occurs when an official acted or failed to act despite his knowledge of a substantial

---

[22] This is not a situation in which an officer used force prior to the issuance of any orders. Rather, Defendant Duck came into a situation involving an inmate altercation and observed Plaintiff failing to comply with orders of other officers.

risk of serious harm. <u>Farmer</u>, 511 U.S. at 834, 841 (quotations omitted); <u>Clem</u>, 566 F.3d at 1181; <u>Hearns</u>, 413 F.3d at 1040. Officials can be held liable for failing to intercede when their fellow officers violate constitutional rights only when they have a reasonable opportunity to intercede. <u>See</u> <u>Cunningham v. Gates</u>, 229 F.3d 1271, 1289-90 (9th Cir.2000).

    2.    *Analysis*

    a.    Defendants Duck, Murrieta, Lowder and Loftis

Plaintiff's failure to protect claim is based on his premise that Defendants Duck, Murrieta and Lowder used excessive force in the first instance. However, as discussed above, the Court has found that the undisputed facts demonstrate that the force used did not violate the Eighth Amendment. Therefore, Defendants Duck, Murrieta, Lowder and Loftis cannot be liable for failing to protect Plaintiff from harm under the Eighth Amendment.[23]

    b.    Defendant Allison

At the time of the events at issue, Defendant Allison was the Warden of CSATF.

Supervisory personnel may not be held liable under section 1983 for the actions of subordinate employees based on *respondeat superior*, or vicarious liability. <u>Crowley v. Bannister</u>, 734 F.3d 967, 977 (9th Cir. 2013); accord <u>Lemire v. California Dep't of Corr. and Rehab.</u>, 726 F.3d 1062, 1074-75 (9th Cir. 2013); <u>Lacey v. Maricopa County</u>, 693 F.3d 896, 915-16 (9th Cir. 2012) (en banc). "A supervisor may be liable only if (1) he or she is personally involved in the constitutional deprivation, or (2) there is a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." <u>Crowley</u>, 734 F.3d at 977 (citing <u>Snow</u>, 681 F.3d at 989) (internal quotation marks omitted); accord <u>Lemire</u>, 726 F.3d at 1074-75; <u>Lacey</u>, 693 F.3d at 915-16. "Under the latter theory, supervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving

---

[23] The parties dispute the distances between the officers. However, this is not relevant to the resolution of the failure to protect claim because the Court has determined that excessive force was not used in the first instance.

force of a constitutional violation." <u>Crowley</u>, 734 F.3d at 977 (citing <u>Hansen v. Black</u>, 885 F.2d 642, 646 (9th Cir. 1989)) (internal quotation marks omitted). "However, an individual's general responsibility for supervising the operations of a prison is insufficient to establish personal involvement." <u>Wesley v. Davis</u>, 333 F.Supp.2d 888, 892 (C.D. Cal. 2004) (internal citations omitted).

Plaintiff's claim against Defendant Allison is based on his argument that she was responsible for staffing positions within the prison, and that her failure to assign correctional staff to stand in front of the Facility G-1 housing unit while inmates were returning from the morning meal led to Inmate Yepiz's attack on Plaintiff. The parties dispute whether Defendant Allison was responsible for drafting post orders, and therefore whether she was responsible for creating a position in front of the Facility G-1 housing unit. However, even if this fact is truly disputed, there is no evidence that Defendant Allison had any reason to believe that not having an officer posted at the Facility G-1 housing unit posed a substantial risk of harm to Plaintiff. It is undisputed that prior to January 19, 2011, Defendant Allison was unaware of any incidents including inmates from Facility G-1 assaulting each other while walking between their housing units and the Facility G dining hall for the morning meal. It is also undisputed that as of January 19, 2011, based on her experience and review of an Operational Procedure, Defendant Allison believed that inmates walking between the Facility G dining hall and their housing units would be supervised by the Facility Sergeant and/or his designees, and were adequately supervised.

Plaintiff also argues that Defendant Allison was aware of severe staff shortages at CSATF in 2010 and 2011, including a shortage of mental health staff in the Facility G-1 EOP program. It is undisputed, however, that Defendant Allison believed that all custody positions at Facility G-1 were filed as of January 19, 2011, and that all assigned correctional staff was in place on that date.

Plaintiff also cites an inmate appeal, dated September 7, 2010, contending that staffing shortages on Saturdays and Sundays at Facility G-1 endangered the safety and security of the

facility, custody staff and inmates.  Allison Decl. ¶ 7.  The parties dispute whether the appeal was limited to staff shortages on Saturdays and Sundays, or whether it addressed staff shortages at all times.  However, even if Plaintiff's appeal could have put Defendant Allison on notice of staff shortages, she addressed the issue, thus negating a finding of deliberate indifference.  In response to Plaintiff's appeal, Defendant Allison explained that, due to the fiscal crisis affecting the State of California and CDCR at that time, selected custody positions were re-directed on a rotational basis.  Facility G was affected during Second Watch on Thursdays and Sundays, and on Third Watch on Tuesdays.  Defendant Allison also noted that two additional custody positions would be added to Building G-1.  ECF No. 1-1, at 109-110.

Therefore, while Plaintiff may not have liked her response, it does not mean that she acted with deliberate indifference.  The Court also notes that the incident in question occurred on Wednesday, January 19, 2011, during Second Watch, when Facility G was unaffected by the re-direction of selected custody positions.  Finally, the two additional custody positions referred by Defendant Allison in the Second Level Response were staffed as of January 19, 2011.

The undisputed evidence demonstrates that Defendant Allison was not deliberately indifferent to a substantial risk of harm to Plaintiff, and she is entitled to summary judgment in her favor.

C.     Medical Care

1.     *Legal Standard*

For claims arising out of medical care in prison, Plaintiff "must show (1) a serious medical need by demonstrating that failure to treat [his] condition could result in further significant injury or the unnecessary and wanton infliction of pain," and (2) that "the defendant's response to the need was deliberately indifferent."  Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012) (citing Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006)).

The existence of an injury that a reasonable doctor would find important and worthy of comment or treatment, the presence of a medical condition that significantly affects an

22

individual's daily activities, and/or the existence of chronic or substantial pain are indications of a serious medical need.  Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000) (citation omitted).

Deliberate indifference is shown by "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need, and (b) harm caused by the indifference."  Wilhelm, 680 F.3d at 1122 (citing Jett, 439 F.3d at 1096).  The requisite state of mind is one of subjective recklessness, which entails more than ordinary lack of due care.  Snow v. McDaniel, 681 F.3d 978, 985 (9th Cir. 2012) (citation and quotation marks omitted); Wilhelm, 680 F.3d at 1122.  Deliberate indifference may be shown "when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care."  Wilhelm, 680 F.3d at 1122 (citing Jett, 439 F.3d at 1096) (internal quotation marks omitted).

    2.    *Analysis*

        a.    Defendant Ross

Plaintiff contends that Defendant Ross intentionally denied and/or delayed treatment for his Leg and neck.

It is undisputed that Defendant Ross examined and interviewed Plaintiff on January 19, 2011, in the Triage and Treatment Area of CSATF.  Plaintiff's chief complaint was facial trauma after an assault, along with complaints of pain to his jaw, the back of his head, and to the front of his left thigh and knee.  Defendant Ross noted these complaints and examined Plaintiff. Defendant Ross found that Plaintiff had discoloration and mild edema to the anterior aspect of his left thigh at the midpoint, tenderness to palpation at various points on his jaw and laceration/disruption of the gum tissue.  Defendant Ross did not observe any obvious signs of a fracture to Plaintiff's left leg, such as a deformity of the Leg.

Plaintiff argues that Defendant Ross did not conduct a "hands-on" examination of his entire left leg, and that Defendant Ross never asked him to completely remove his pants.  While Plaintiff may have wanted a more thorough examination, this does not dispute the fact that

Defendant Ross noted Plaintiff's complaints of pain in his left leg, and performed enough of an examination to determine that he had discoloration and mild edema, with no obvious signs of a fracture.

Defendant Ross also consulted with Dr. Lee, a dentist, who ordered panorex x-rays of Plaintiff's jaw. Defendant Ross assessed Plaintiff as having a fractured mandible and arranged for Plaintiff to be transported to Mercy Hospital, where he would be evaluated by Dr. Mui, who could provide a higher level of care for his jaw fractures. Defendant Ross believed at the time that Plaintiff's most serious medical need, which required immediate medical attention, was his fractured jaw.

It is undisputed, then, that Defendant Ross noted Plaintiff's complaints of pain in his Leg, and found discoloration and mild edema, but no obvious signs of a fracture. However, the parties dispute whether Defendant Ross intended to provide treatment for Plaintiff's Leg injury.

According to Plaintiff, Defendant Ross told him that he would not receive treatment for his Leg or neck because he was assaulted by staff. Defendant Ross denies making this statement, or directing anyone at Mercy Hospital to deny treatment, contending instead that he believed that Plaintiff would receive treatment for all injuries at Mercy Hospital. Ross Decl. ¶ 6 .

Viewing the evidence in the light most favorable to Plaintiff, and assuming that Defendant Ross (1) told Plaintiff that he would not receive any treatment for his Leg or neck injuries; and (2) refused to write a referral for such treatment, a reasonable jury could find that Defendant Ross was deliberately indifferent to Plaintiff's serious medical needs. That Defendant Ross documented the injuries in his triage notes does not change this result, as his triage notes are separate from his ultimate instructions to Mercy Hospital.

Defendant Ross argues that even if he told Plaintiff that he would not receive treatment for his Leg and neck, there is no evidence that he told anyone at Mercy Hospital to deny

treatment.  While this may ultimately be true, there is no evidence that he *referred* Plaintiff for such treatment, either.[24]

Defendant Ross also argues that Plaintiff ultimately received treatment for his left leg injury at Mercy Hospital, after an x-ray revealed a non-displaced fracture.  He therefore contends that, at most, his statement resulted in a delay of treatment.  Contrary to his argument, a delay in treatment may support a finding of deliberate indifference.  Clement v. Gomez, 298 F.3d 898, 904 (9th Cir. 2002) (The needless suffering of pain may be sufficient to demonstrate further harm).  This is especially true where the Court has recommended denial of Defendant Mui's motion for summary judgment based on the existence of a dispute as to whether Defendant Mui failed to provide treatment for Plaintiff's leg injury despite Plaintiff's complaints.[25]

For these reasons, the Court recommends that summary judgment be denied as to Defendant Ross.

b.     Defendant Neubarth

Plaintiff alleges that Defendant Neubarth refused to provide treatment for his leg injuries and failed to submit forms for his follow-up dental appointments.

The following facts are not disputed.  Plaintiff saw Defendant Neubarth at the CTC at CSATF on January 21, 2011, after he was discharged from Mercy Hospital.  The discharge summary from Mercy Hospital referred to Plaintiff's jaw surgery, but did not mention a left leg injury.  Defendant Neubarth provided treatment for Plaintiff's jaw, including a special diet, wound observation and pain control.  The pain control consisted of acetaminophen with codeine, followed by Naproxen and Ibuprofen, taken three times per day.  Plaintiff also complained of

---

[24] The Court notes that the Health Care Services Request Form completed by Defendant Ross lists only a mandibular fracture.  The Court also recognizes, however, that the form only requires a "principle diagnosis." Nonetheless, viewing the evidence in the light most favorable to Plaintiff, there is no evidence that Defendant Ross requested any treatment for Plaintiff's leg or neck once he arrived at Mercy.

[25] Defendant Ross also cites the Declaration of Dr. O'Brien, submitted in support of Defendant Mui's motion for summary judgment, in which Dr. O'Brien opines that the treatment for a non-displaced fracture is bed rest and medication.  In recommending that Defendant Mui's motion be denied, the Court explained that the fact that Plaintiff coincidentally received the suggested treatment did not require a finding that he was not deliberately indifferent.

pain in his left knee and lower thigh during the visit, and Defendant Neubarth felt that the pain medications he prescribed would provide adequate pain control for Plaintiff's leg complaints.

It is further undisputed that Defendant Neubarth examined Plaintiff's left leg again on January 24, 2011, and observed that there was almost no swelling about the left knee and thigh, although there was some discoloration in the area. In response to Plaintiff's continued complaints of pain in his left leg, Defendant Neubarth performed a bedside ultrasound examination of his left leg, which was normal. He also ordered x-rays of the left leg and knee to determine if a fracture had occurred. Defendant Neubarth received a report from the radiologist, who interpreted the x-rays as demonstrating a vertical lucent line with sclerosis along the lateral aspect of the femoral condyle, which most likely represented an osteophyte, rather than a true fracture. The report stated that there were no intraarticular free fragments and no suprapatellar effusion. No displacement or deformity was noted.

Defendant Neubarth interpreted the results of the ultrasound and x-ray studies as demonstrating that Plaintiff had not sustained a fracture of his left thigh, and that he was suffering from a bruised thigh. He therefore maintained the prescription for Naproxen and Ibuprofen and recommended gentle range of motion care consisting of daily movement and stretching to enhance the healing process and prevent the development of complications.

Defendant Neubarth continued to monitor the condition of Plaintiff's left leg on January 27 and 30 and February 2, 4 and 7, 2011. Defendant Neubarth's examinations showed no swelling or deformity of the left leg. Defendant Neubarth also ordered follow-up x-rays of the left leg on February 16, 2011.

The undisputed evidence therefore shows that Defendant Neubarth examined Plaintiff repeatedly and continued to monitor his left leg. He ordered x-rays and performed an ultrasound examination. Although Plaintiff may have wanted an MRI or other diagnostic testing, this does not mean that Defendant Neubarth was deliberately indifferent to Plaintiff's Leg injury. "A difference of opinion between a physician and the prisoner - or between medical professionals -

26

concerning what medical care is appropriate does not amount to deliberate indifference." Snow v. McDaniel, 681 F.3d 978, 987 (9th Cir. 2012) (citing Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989)), overruled in part on other grounds, Peralta v. Dillard, 744 F.3d 1076, 1082-83 (9th Cir. 2014); Wilhelm v. Rotman, 680 F.3d 1113, 1122-23 (9th Cir. 2012) (citing Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1986)).

Similarly, Plaintiff's contention that Defendant Neubarth's direction to continue gentle range of motion exercises was somehow deliberately indifferent fails.  Again, this is nothing more than a disagreement with treatment and does not rise to the level of an Eighth Amendment violation.  Where there is a disagreement with treatment, Plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that the defendants chose this course in conscious disregard of an excessive risk to [his] health." Snow, 681 F.3d at 988 (citing Jackson, 90 F.3d at 332) (internal quotation marks omitted).  Other than Plaintiff's own opinion, he does not provide any competent evidence to contradict Defendant Neubarth's professional opinion.  Based on Defendant Neubarth's review of the January 24, 2011, x-ray study and his observation of Plaintiff, he believed that Plaintiff had not sustained a fracture to his left leg, and that he should continue to try and improve the range of motion.  In his experience, he knew that exercising a limb which has been injured can be painful in the short term, but that improving range of motion is preferable to possible complications that can result from excessive immobilization.

To the extent that Plaintiff suggests that Defendant Neubarth's treatment was deliberately indifferent because the Mercy Hospital x-ray showed a non-displaced fracture, he is incorrect. Even if Defendant Neubarth knew of the prior x-ray, he was entitled to perform his own examinations and order additional testing, and then come to his own professional conclusions.

The Court also notes that an Eighth Amendment claim may not be premised on even gross negligence by a physician.  Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990).

Turning to Plaintiff's contention that Defendant Neubarth intentionally failed to submit forms to ensure that Plaintiff received two follow-up appointments with Dr. Suesberry for jaw treatment, the parties dispute whether it was Defendant Neubarth's responsibility to schedule such appointments.

For the first follow-up appointment, it is undisputed that Dr. Beregovskaya submitted the request for services on February 8, 2011, and that Plaintiff saw Dr. Suesberry on February 22, 2011. During that appointment, the bars holding Plaintiff's teeth together were removed, though other hardware remained in place. Plaintiff argues that this appointment should have occurred on February 8, 2011, pursuant to Defendant Neubarth's notations in his January 21, 2011, treatment notes calling for a two-week follow up. ECF No. 227, at 192. Plaintiff also states that Defendant Neubarth completed a form, but did not submit it.

Assuming that Defendant Neubarth intended for Plaintiff to be seen on February 8, 2011, and that it was his responsibility to submit the appropriate forms, any failure to do so was a mistake, at most. Viewing the evidence in the light most favorable to Plaintiff, there is no evidence that Defendant Neubarth acted with deliberate indifference.

Plaintiff also argues that Defendant Neubarth failed to submit a request for services for a March 8, 2011, appointment with Dr. Suesberry. He argues that this failure resulted in a fifty-five day delay in removing the remaining hardware. However, it is undisputed that once the occlusion bars were released on February 22, 2011, CTC procedure called for Plaintiff to be released from the CTC. Indeed, Plaintiff was released from the CTC on February 23, 2011, and his care was transferred to health care personnel assigned to Plaintiff's housing area. Defendant Neubarth understood that health care personnel assigned to the portion of the prison where Plaintiff was housed would provide appropriate follow-up care. Plaintiff denies this, arguing that the responsibility remained with Defendant Neubarth. However, where Plaintiff is no longer under his care, he cannot be deliberately indifferent for not providing additional care. Even if Defendant Neubarth remained responsible, he believed that Plaintiff's new treatment team would

28

take care of follow-ups.  Again, at most, this was a mistaken belief and is not evidence of deliberate indifference.

Based on the above, the Court recommends that Defendant Neubarth's motion for summary judgment be granted.

                  c.          Defendant Ancheta

Plaintiff alleges that Defendant Ancheta deliberately failed to submit a request for follow-up treatment after Plaintiff informed her that he missed a March 8, 2011, appointment with Dr. Suesberry for removal of the remaining hardware.

It is undisputed that Defendant Ancheta first saw Plaintiff on February 8, 2011, and prescribed a mouth rinse pursuant to Plaintiff's request.

She saw Plaintiff again on March 9, 2011, after Plaintiff submitted a Request for Health Care Services form on February 23, 2011.  Defendant Ancheta examined Plaintiff and found that the brackets and wires were still present, and that a tooth had a traumatic occlusion.  Defendant Ancheta leveled the tooth to an acceptable level.  Since Plaintiff was only approximately six weeks post-injury, Defendant Ancheta was concerned whether his jaw fractures had healed sufficiently to proceed with the removal of the remaining brackets and wires.  In her experience and training, removing surgical hardware from a fractured jaw prematurely could lead to further injury.  Defendant Ancheta then ordered panoflex x-rays.

After March 9, 2011, Plaintiff was transferred to a different yard and Defendant Ancheta did not have any responsibility for his follow-up dental care.  Plaintiff was next examined by Dr. Lee, a dentist on G Yard, on April 1, 2011.  Dr. Lee made arrangements for Plaintiff to be sent to an outside specialist for the removal of the remaining brackets and wires.

Plaintiff argues that Defendant Ancheta told him that she would request the follow-up appointment, and suggests that she would never have removed the hardware herself.  Defendant Ancheta's testimony, however, is consistent with Plaintiff's contention.  Assuming Plaintiff requested a follow-up appointment with Dr. Suesberry and that Defendant Ancheta told him that

she would take care of such a request, it is reasonable to conclude that she would have examined Plaintiff to determine if he was even ready for a follow-up appointment to remove the hardware. There is no indication that she intended to remove the brackets and wires herself.  Indeed, Defendant Ancheta states that she understood that once the results of the x-rays were reviewed, and a follow-up examination of Plaintiff's jaw was completed, a referral to an outside specialist for removal of the hardware could be made.

Plaintiff also disputes the reasons for the panoflex x-rays, arguing that they were connected to his regular dental care and had nothing to do with evaluating his jaw injury.  Her treatment notes do not support such a finding, stating only "PANO taken" and that Plaintiff was to have a comprehensive exam after the brackets were removed.  In any event, the fact remains that Defendant Ancheta examined Plaintiff thoroughly to determine whether his hardware was ready for removal.

There is simply no evidence, other than Plaintiff's opinion, that Defendant Ancheta acted with deliberate indifference.  The Court therefore recommends that summary judgment be granted in favor of Defendant Ancheta.

C.    QUALIFIED IMMUNITY

Qualified immunity shields government officials from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982).

 In ruling upon the issue of qualified immunity, the initial inquiry is whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the defendant's conduct violated a constitutional right.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  If, and only if, a violation can be made out, the next step is to ask whether the right was clearly established. Id.  In resolving these issues, the court must view the evidence in the light most favorable to plaintiff and resolve all material factual disputes in favor of plaintiff.  Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).

The Court will only discuss qualified immunity as to Defendant Ross, as it has found that the remaining Defendants did not violate a constitutional right.  In this instance, the evidence viewed in the light most favorable to Plaintiff demonstrates a constitutional violation, and there exist triable issues of fact as to whether that right was violated.  Therefore, the Court proceeds without further discussion to the second step of the inquiry.

"For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right."  Hope v. Pelzer, 536 U.S. 730, 739, 122 S.Ct. 2508 (2002).  While the reasonableness inquiry may not be undertaken as a broad, general proposition, neither is official action entitled to protection "unless the very action in question has previously been held unlawful."  Hope, 536 U. S. at 739.  "Specificity only requires that the unlawfulness be apparent under preexisting law," Clement v. Gomez, 298 F.3d 898, 906 (9th Cir. 2002) (citation omitted), and prison personnel "can still be on notice that their conduct violates established law even in novel factual circumstances," Hope, 536 U.S. at 741.

In 2011, an inmate's right to be free from deliberate indifference to a serious medical need was clear.

The Court recognizes that the existence of material factual disputes does not necessarily preclude a finding of qualified immunity.  Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1053 (9th Cir. 2002).  "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open Legal questions," Ashcroft v. al-Kidd, __ U.S. __, __, 131 S.Ct. 2074, 2085 (2011).  Here, however, assuming the facts in the light most favorable to Plaintiff, no reasonable officer would have believed that telling an inmate that he would not receive treatment for a serious medical need because he was assaulted by staff was lawful.

Accordingly, Defendant Ross is not entitled to qualified immunity.

## V.   **FINDINGS AND RECOMMENDATIONS**

For the reasons set forth above, the Court HEREBY RECOMMENDS that summary judgment be GRANTED as to Defendants Allison, Murrieta, Duck, Loftis, Lowder, Neubarth and Ancheta, and DENIED as to Defendant Ross.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within thirty (30) days after being served with these Findings and Recommendations, the parties may file written objections with the Court.  Local Rule 304(b).  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections must be filed within fourteen (14) days from the date of service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   __**August 3, 2015**__                    _____ /s/ *Dennis L. Beck*
                                              UNITED STATES MAGISTRATE JUDGE